2014, 5060. I'm Mr. Saltner. Good morning, Your Honor. May it please the Court. In Salazar v. Rama, the Supreme Court indicated that in order to determine the meaning of the term subject to the availability of appropriation, that language, when used in a statute as it relates to who should bear the risk of underfunding, it is necessary to examine additional evidence of congressional intent. In this case, the Court of Federal Claims failed to do so, relying instead solely on the absence of a contract and deeming the Payments in Lieu of Taxes Act as merely a gratuitous benefit program, not the subsidy guarantee that it is. Well, the absence of a contract makes a big difference. The government is obligated under contract quite differently from other grants that it may make. There's no difference that the obligation is different, Your Honor. What Rama did was to reject the across-the-board indication that subject to the availability meant that the government's liability ended automatically when the funds in the account ran out. What they suggested... Even if we accept that proposition, though, isn't it true that what we have to do is to look at the statute that is at issue to determine whether this government intended to obligate the United States to pay some person? I think Rama goes beyond that, Your Honor. And it says that you must look at the legislative intent. Perhaps it may be more basic than that. So let me ask you, are you saying that the statute in this instance establishes a contract or does it establish benefits that are being paid out? It does not establish a contract. It establishes a subsidy to these counties and it was intended, the Payment in Lieu of Taxes Act was passed in 1970... If it's a benefits statute, then it runs up against our own precedent. And I think, isn't the precedent pretty clear in this instance? Well... Haven't we ruled in this exact question? In that case, Your Honor, and you're talking about the Greenlee case, that was before Rama, and before Rama indicated that what was necessary is a review of congressional intent. In this case, as I said, the Payment in Lieu of Taxes Act provided a guarantee to local governments against future shortfalls in revenues by providing a commensurate subsidy. The prior system had provided money to the counties based on revenue sharing programs. They went up and down based on oil production, timber sales, etc. Pursuant to the statutory formula set forth in the PILT Act, when revenue sharing amounts declined, the payment in lieu of tax subsidy increased to cover the shortfall. But if we're talking about legislative intent, I mean, again, we have to go back. I'm looking at the Senate committee report, and it specifically says that subsection A contains the proviso stating that no funds may be made available except to the extent they're provided in advance in appropriation. But then it says, it also provides that when less than the full amount is appropriated, the payments to each unit of local government are reduced proportionally. Isn't that exactly what the government is arguing here? Yes, and that phrase about the reduction of the payments was never enacted. You're reading from the Senate report, that's the Senate's markup, and they included that sentence. It was not enacted when Congress passed the bill. But ROMA is decided in the background of a contract, correct? ROMA was decided in the background of a statute that required a contract, but the subject-to-the-availability language existed both in the statute and in the contract. What does it say that its reasoning applies outside of the contract context and to the benefits? It says on page 2193, and what it says there, Your Honor, is that ROMA was rejecting the widely held view, and I'll get to the quote in a second, that subject-to-the-availability language means that the United States' duty to make payments terminates when the total amount appropriated by Congress is exhausted, in the absence of evidence that Congress intended that a recipient bear the risk of a lump sum appropriation that was insufficient to pay all recipients. And I'm quoting from 2193. So that's the question that we have to look at. What is the evidence that the government did not intend to be bound in the circumstances that are at issue here? Now, isn't the fact that after Cherokee Nation, that Congress amended this current statute to make it clear that payments are to be made indicative of the fact that Congress recognized that the earlier statute did not clarify that? I think it's indicative of the fact that Congress wanted to make sure that counties received full payments. If I may, Your Honor, if the analysis that we're suggesting is accomplished, we believe that the court will find not only that there is no evidence of any congressional intent to impose the risk of under-appropriation on the recipients with regard to subsidy payments, but, as I pointed out, there is in fact evidence that Congress did not intend to reduce those subsidy payments when there was under-appropriation. The statutory formula in the statute for determining the amount of the subsidy was intended to guarantee that each county would receive at least a specific total amount from the United States. Secondly, in enacting the Payment in Lieu of Taxes Act, Congress chose not to limit the subsidies to be paid all of the counties to the amount appropriated by Congress. As Your Honor pointed out, in the markup of the Senate version, they include a certain language. But the language that you're quoting, which I will repeat, is, in the event the sums appropriated for any fiscal year to make payments pursuant to the Act are less than the amounts necessary to pay all units of local governments, then the payment or payments to each local government shall be proportionally reduced. That language was deliberately omitted in the final version of the PILT Act as it passed Congress in 1976. Such language was never included in any of the many amendments to the Payment in Lieu of Taxes Act made since then. Not including this language in the Payment in Lieu of Taxes Act makes clear that Congress did not intend to limit the liability of the government for all annual formula payments to the amounts appropriated by Congress. What about 31 U.S.C.A. 6906? We're talking about that, Your Honor. That's what I thought. Necessary amounts may be appropriated, amounts are available only as provided in appropriations. As this Court held, that that is the functional equivalent of being subject to the availability of appropriations. That's almost an exact quote from Greenlee County. The question now is, what does that term mean in light of ROMA? And ROMA withdrew, as I said, the across-the-board view that was held by this circuit and many other circuits, but that language meant that when the money in the appropriation account is exhausted, the government's liability ends. ROMA says that's not the question. The question is, what is Congress's intent? Did Congress intend to put that risk on the recipients? If the answer is yes, obviously we would lose. If the answer is no, as I believe the case is here, then we would prevail. Okay. Even if, again, even if we agree with your proposition that ROMA changes the analysis that we used in Greenlee, and that the underlying assumption that this appropriations language is always enough to remove the obligation, that that's gone. Here we have ROMA on one end where they mentioned the word contract 46 times in the statute where there were very specific criteria laid out. That's true. So what is it in this very cryptic statute where we're not even clear what the funds are going to be used for at the local level? What is it in this statute that you think establishes congressional intent to bind Congress to the, bind the government to the contract? Well, first of all, Your Honor, I would say that they, the formula that was used in the statute, prior to the enactment of PILT, these counties were receiving funds from the federal government in lieu of taxes. And that took the form of a shared receipts program. Congress recognized that that wasn't working. It varied up and down. It provided no predictability. And there were many years when it was insufficient to cover the taxes that had been foregone. Right. So before, there were tons of times when parties weren't getting fully repaid. Now Congress wants to reduce the extent to which there are no… PILT comes along and provides, in effect, a guarantee, a sort of insurance policy. That's my question. Where do you find the guarantee? You look at it in, that's the way the statutory formula works. When receipts decline, the formula steps in automatically and increases the subsidy. Congress did not want these counties to go wanting in the event, in any event, certainly not the event of under-appropriation. It was a subsidy to guarantee a stable level of receipts from the United States to these counties. That's first of all. Second of all… Where in the formula description does that happen? It requires, how the formula is computed in the first part, it said the formula will be, I think it's 71 cents per acre, reduced by the amount of revenue sharing funds received by the county from, and it lists about eight separate programs. So if you put that together, you can see that when the receipts are high… Under that formula, the money's going to run out at some point. Under that… If there's not enough money that's been appropriated, then money will run out. Well, I think that's a separate question, Your Honor. But under the formula, the amount due to the county increases when the revenue sharing amounts decrease. When revenue sharing is high, the amount of PILT payment is very, very low. This case doesn't revolve around the formula, though, does it? Oh, yes, it does, Your Honor. It revolves around what happens when the appropriated amount has been… True. True, Your Honor. What this case is about. But what I'm saying is that Rama requires the court to examine the intent of Congress very carefully. Now, Rama says that if the money runs out, and yet you have a contract in place, the government is still obligated to fulfill that contract. But it doesn't speak out to what they're calling the subsidies program. Rama talks, and I'm quoting you, Your Honor, that the thing that has to be looked at is in terms of interpreting, subject to the availability language, does it destroy the government's liability when there's no money left? Quote, evidence that Congress intended that the recipient bear the risk that an appropriation will not prove sufficient to pay all recipients. That's what this court has to look at. What is that evidence? And we submit that the evidence lies in the fact that the formula was intended to make these payments, the total payments received by the counties, stable. And if Congress wanted to have reduced the liability of the government, it would have included that sentence from the Senate report that they chose not to adopt. Thank you. Mr. Salzman, I assume you want to save your rebuttal time? I do, Your Honor. Ms. Snyder. May it please the Court. This court held in Greenlee County v. United States in May of 2007 that the government's liability for payment to local governments under the Payment in Lieu of Taxes Act, or PILT, is limited to the amounts appropriated by Congress. That ruling is controlling precedent here. There's been nothing in the law or the facts that changes. You think there's nothing in Rama that calls into question the analysis in Greenlee County? There is nothing in Rama, Your Honor. Rama was specifically focused on government contracts. The Rama court specifically said, we are relying on the well-established principles of government contracts in reaching our decision. The Rama case looked at legislative intent, no doubt about that. The legislative intent indicated that Congress wanted the government to enter into contracts with local Indian tribes to perform services in payment for, the government was going to provide payment for services that the government had previously. Couldn't congressional intent to bind the government to a specific payment appear just as clearly in a benefits program as it could in a contract?  Your Honor, and in fact the Greenlee County Court recognized that there were statutes that required payments without contracts. For example, the New York Airways case and the New York Railway Central case, the Langston versus United States case, all relied on a statute that provided for the payment of specific amounts for services rendered. For example, in Langston, Langston was an ambassador to Haiti. The statute provided $7,500 for his ambassadorship. Congress only appropriated $5,000. He sued, and the court found, yes, the statute provides and obligates and guarantees you $7,500, and you have a cause of action, and you have damages under that contract. So under ROMA, when you have a statute that creates a contract, the government is obligated to meet its obligation of fulfilling the full payment under that contract. Does it say anything as to a benefits program? Is it silent as to a benefits program, or does it speak to a benefits program? ROMA does not speak to a benefits program, and appellants request, ask this court to broaden ROMA beyond its actual scope. The facts in ROMA that the court relied upon are important. There was a contract between the government and the Indian tribes. There was a model contract in the statute that Congress required the government to use. The statute provided that the Indian tribes could, under the Contract Disputes Act, go to court if payment was not full and sue for full payment. But didn't ROMA very broadly do away with this notion that subject to appropriation is very meaningful in this context and say that what we have to look at is Congress's intent to be bound? In that case, they then looked at the contractual references. Even in our Greenland County case, we distinguished Cherokee Nation, and that ground upon which we distinguished Cherokee Nation was rejected by Justice Sotomayor in ROMA. Only, Your Honor, in the context of contracts. The statutes here provide specifically necessary amounts may be appropriated to the Secretary of the Interior to carry out this chapter. Amounts are available only as provided in appropriations law. The congressional intent, Congress said what it meant. That is, that we are in circumstances where we don't have the money, we don't have the budget, you may not get a full statutory formula payment. Is it telling, though, that the minute Cherokee Nation comes out, Congress, when it was actually doing things, amended this statute to say, you've got to make these payments? I mean, today, you wouldn't argue that it was limited to appropriations that are available, would you? It would depend on the facts, Your Honor. The statute right now says, Congress shall appropriate all monies necessary to pay for these programs. But that's not the language that we're talking about in this case. I understand that, but isn't it telling that once Cherokee Nation came out, and even before ROMA, Congress amended the statute to make it clear what they intended? And so what you're suggesting, Your Honor, is that the language prior to Cherokee Nation reflected congressional intent in that Congress said, we will appropriate certain funds. And those funds will be, that is the only amount that will be available for payment under the statute. And the government comes back to the plain language of ROMA and the fact that ROMA strictly applied the principles there within the government contracting context. It did not go beyond that, and there is no reason for this court to go beyond that, given the congressional intent in the PILT statute that specifically says, amounts are to be appropriated up to a certain, whatever the, even if you don't meet the. Where else do you get the congressional intent from other than that phrase? Well, the Senate report reflects that, exactly, approvingly to that language. But the Senate report says there's actually a provision that talks about pro-rate of share if the money runs out, and that provision was removed from the final bill, was it not? It was, and the Secretary of the Interior, under its authorization to manage the statute, filled that gap and passed regulations that provide for a pro-rate of share. And so where there is a gap, and there may have been, there was a gap in the statute in terms of, well, what are we going to do if Congress, in fact, doesn't appropriate the full amount? The Department of the Interior stepped in and passed regulations that provide for pro-rate of shares, and that's exactly how Greenlee County and Prairie County were paid in 2006 and 2007. So you're arguing that there was at least an ambiguity in the statute that was explained in the regulations, and we have to give deference to those regulations? Absolutely, absolutely. If there was a gap in terms of, well, what are we going to do if amounts are not appropriated, as it suggests in the statute, may happen, then the Department of the Interior stepped in and provided regulations to fill that gap. Appellants here are attempting to basically hamstring Congress and insist that Congress appropriate funds for a statute when it has a number of budgetary concerns and specifically indicated, at least in 2006 and 2007, the area, the context within which we're looking at, that we're going to appropriate funds, you know, the amounts are available only as we appropriate them. So when you look at the language in all these different cases, they're pretty much the same. I mean, we can make distinctions, but we're almost talking about the same type of language. Rama says that the government's obligation continues on in the case where the statute establishes a contract. What's the guiding principle here with respect to what Rama said in connection with the benefit statute? Is there anything that we can take from Rama and say, this is what's going to guide this court with respect to its existing precedent? The Rama court, the principles under the Rama court are focused on government contracting, and it should be reviewed and analyzed only in the context of government contracts. It does not extend to a benefits program, and there's no language in Rama that anyone can point to that suggests otherwise. You think there's a bright line distinction between a government contract and a benefits program. The reality is that I don't read Rama to draw that bright line distinction. I read Rama to say, did the government intend to be bound like it would be in a contract, or did it not? And so I think that not all benefits programs would be as open to this, we don't have to pay them if we don't want to, response. I think there are plenty of benefits programs, including now the current version of this one, where Congress has made it clear we want to pay these people. So that's my problem with your argument, is that I don't think the distinction is as bright as you are drawing it. In terms of congressional intent, the principles of statutory construction apply within the context of Rama and outside of the context of Rama. And so it is the court's job to look at the statute and determine what the legislative intent was in the statute. Tell me where in the statute, other than that one phrase, that you find legislative intent. In legislative history, in other portions of the statute? I mean, your friend on the other side argues that the formula itself that's within the statute is a different intent. Your Honor, the government rests in part on 6906, which in fact provides a clear statement of legislative intent that with respect to this statute, the amounts will be appropriated. And those amounts appropriated will be distributed to local governments. In terms of Rama, the Rama court also looked at legislative intent, but it did so in the context of government contracting. And going back to Rama, the rationale for Rama was clearly stated by the court. And it included the concern that a government contractor has to count on payments for the services that it provides without having to keep an eye on appropriations at every moment. On the one hand, and the government has a vested interest in being a reliable contracting party. That's not the case with PILT. There are no services that are provided specifically for the payments that are made. Certainly, the PILT is designed to mitigate the loss of tax revenues because of federal lands in a particular local area. There's no question about that. But at least within the confines of this particular case, it is clear from 6906. What's the difference between some of the earlier cases, the ambassador to another country where he establishes a fixed figure as the payment for the services rendered. And in this instance, for example, the counties are given a formula, an allocation formula. In cases such as the Langston case where there is a specific set amount, there is no, as you've noted, there is a formula, but there is no specific set amount that needs to be transferred to each local government. Wasn't there a promise that was intended to be relied on? No, there is no binding obligation here in any of the statutes. There's no promise. There is a suggestion that these funds are to be used in order to mitigate the loss of their funds. But isn't there a promise? I mean, I echo Judge Lurie here. Isn't there a promise that because of what's happened with the removal of your revenues, your revenues are diminished. So the payment in lieu of taxes is we're going to establish this formula to put you whole. Isn't that a promise? To make the county whole. There is no suggestion anywhere in the statute that there is going to be a specific amount of money provided to any particular local government. There's no promise. There was an intention, but not a binding contract. Exactly. Certainly there was an intention to mitigate the loss of revenues, the loss of tax revenues. That's certainly the point of the statute. But there is no binding obligation that any particular amount needs to be provided to any particular local government. If there are no further questions, the government respectfully requests that the judgment of the trial court be affirmed. Thank you, Ms. Snyder. Mr. Saltzman has a couple of minutes, two minutes for a vote. Just a couple of things, Your Honor. My opponent said that Rama only deals with contracts. And I think at some other point she did say that you are required to determine legislative intent. We couldn't agree with that more. The quote that I have cited at 12193 asks this court or any court to look for the evidence that Congress intended. That's words of statutory, not words related to a contract. Did Congress intend that the recipient bear the risk of underfunding? Greenlee County, we're not saying it was incorrect at the time. What we're suggesting is that it needs to be revisited in the wake of Rama. That's all. What about, I mean, again, even if we agree with you that we're looking for congressional intent in this statute, this statute does not have all of the pieces and parts that the Rama statute did. It is certainly a very different statute, yes, Your Honor. So it's your burden to establish that in fact congressional intent was something other than the government's intent? Yes. And the government says that at minimum we should find that the statute was ambiguous and that therefore its ambiguities can be filled in or resolved by reasonable regulations to which we must defer. And I don't think in this case deferring is appropriate because if you look at the legislative history, the legislative history, the Senate report made it very clear that we are going to limit the government's liability to the amount appropriated. It didn't get enacted. Yet the regulation comes along and says notwithstanding the fact that Congress didn't impose that, we're going to impose that. That violates the intent of Congress. It's not entitled to deference under the Milwaukee case and under the Stargo case of this court. So I don't think that they can step in and say the regulation fills that void. I'm not even sure regulations were authorized in this instance. Do you have a final thought? I think you should reverse the Court of Federal Claims. Okay. Thank you very much, Mr. Saltzman. The case will be taken under revised.